UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTA FREITAG, Court-appointed permanent receiver for ANI Development, LLC; American National Investments, Inc.; and their subsidiaries and affiliates,<br><br>　　　　　　　　　　　　Plaintiff,<br><br>v.<br><br>KIM H. PETERSON, individually and as Trustee of the Peterson Family Trust dated April 14, 1992, and as Trustee of the Peterson Family Trust dated September 29, 1983; KIM FUNDING, LLC, a California limited liability company; ABC FUNDING STRATEGIES, LLC, a Delaware limited liability company; ABC FUNDING STRATEGIES MANAGEMENT, LLC, a Delaware limited liability company; ANI LICENSE FUND, LLC, a California limited liability company; KIM MEDIA, LLC, a California limited liability company; KIM MANAGEMENT, INC., a California corporation; KIM AVIATION, LLC, a California limited liability company; AERO DRIVE, LLC, a California limited liability company; | Case No.: 21-CV-1620 TWR (AHG)<br><br>**ORDER GRANTING RECEIVER'S MOTION FOR SUMMARY JUDGMENT**<br><br>(ECF No. 67) |

1

| | |
|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7 | AERO DRIVE THREE, LLC, a California limited liability company; BALTIMORE DRIVE, LLC, a California limited liability company; GEORGE PALMER CORPORATION, a Nevada corporation; KIM FUNDING LLC DEFINED BENEFIT PENSION PLAN; and DOES 1 through 10, inclusive,<br><br>                              Defendants. |

       Presently before the Court—for the third time—is the Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Mot.," ECF No. 67) filed by Plaintiff Krista Freitag, the Court-appointed permanent receiver for ANI Development, LLC; American National Investments, Inc.; and their subsidiaries and affiliates (the "Receivership Entities" or "Entities"), as well as the Opposition (ECF No. 73) filed by Defendants Kim H. Peterson, individually and as trustee of the Peterson Family Trust dated April 14, 1992 (the "1992 Trust"), and as trustee of the Peterson Family Trust dated September 29, 1983 (the "1983 Trust"); Kim Funding, LLC ("Kim Funding"); ABC Funding Strategies, LLC ("ABC Funding"); ABC Funding Strategies Management, LLC ("ABC Management"); ANI License Fund, LLC ("ANI License"); Kim Media, LLC ("Kim Media"); Kim Management, Inc. ("Kim Management"); Aero Drive, LLC ("Aero Drive"); Aero Drive Three, LLC ("Aero Drive Three"); Baltimore Drive, LLC ("Baltimore Drive"); George Palmer Corporation ("George Palmer Corp."); and Kim Funding LLC Defined Benefit Pension Plan ("KF Pension Plan") and Plaintiff's Reply (ECF No. 74). Through the instant Motion as originally filed, the Receiver sought summary adjudication in her favor as to her first cause of action against all Defendants jointly for avoidance and recovery of fraudulent transfers in violation of California's Uniform Voidable Transactions Act ("CUVTA"), Cal. Civ. Code §§ 3439–3439.14, in the amount of $6,120,570.35, plus prejudgment interest; seventh cause of action against ANI License for breach of contract (promissory note) in the amount of $9,706,387.77; and eighth cause of action against

Defendant Peterson, as trustee of the 1992 Trust, for breach of contract (guaranty) in the amount of $6,582,886.94.

The Court held a hearing on November 7, 2024, (*see* ECF No. 86; *see also* ECF No. 87 ("Tr.")), following which the Court granted in part and denied in part the Motion, (*see generally* ECF No. 88 (the "1st Prior Order")), entering judgment in the amount of $6,063,573.89 in favor of the Receiver and against Defendant ANI License on the Receiver's seventh cause of action for breach of contract (promissory note) and against Defendant Peterson, as trustee of the 1992 Trust, on the Receiver's eighth cause of action for breach of contract (guaranty), jointly and severally. (*See id.* at 13–17.) The Court denied without prejudice, however, the Motion as to the Receiver's first cause of action for avoidance and recovery of fraudulent transfers in violation of CUVTA pending supplemental briefing regarding whether the Receiver should be permitted to amend her Second Amended Complaint to conform to the proof presented at summary judgment.[1] (*See* 1st Prior Order at 10–13, 17–18.)

Upon reviewing the Receiver's (ECF No. 89) and Defendants' (ECF No. 90) supplemental briefs, the Court granted the Receiver's request to conform the Second Amended Complaint to the evidence submitted at summary judgment and—to mitigate any concerns of prejudice—granted Defendants leave to file a further supplemental brief addressing the Receiver's arguments concerning their joint liability under Sections 3439.07(a)(3)(C) and 3439(b)(1)(A) of the California Civil Code. (*See generally* ECF No. 95 (the "2d Prior Order").) Defendants declined to file a further supplemental brief, (*see generally* Docket; *see also* ECF No. 96 at 3), and, consequently, the Receiver declined to file a responsive brief. (*See id.*)

---

[1] The Court also denied without prejudice the Receiver's request for attorneys' fees and costs against ANI License, (*see* 1st Prior Order at 13–15), and Mr. Peterson, (*see id.* at 17), attributable to the enforcement of the Promissory Note and the Guaranty, respectively. Although the Court permitted the Receiver the opportunity to file supplemental briefing to support the requested fees and costs, "the Receiver . . . determined not to further pursue the attorneys' fees portion of her seventh or eighth claims for relief." (*See* ECF No. 89 at 1; *see also id.* at 9–10.)

Accordingly—at long last—the Court concludes that the record is closed and that the Court may rule on the merits of the sole surviving issue from the Receiver's Motion, namely, whether the Receiver is entitled to summary adjudication on her first cause of action for avoidance and recovery of fraudulent transfers against Defendants. Upon careful consideration of the Parties' arguments, the record, and the applicable law, the Court **GRANTS** the Receiver's Motion, as follows.

## UNDISPUTED FACTS[2]

The Parties are familiar with the facts underlying this action and have agreed to a comprehensive set of 203 undisputed material facts, (*see* ECF No. 67-7 ("Jt. Stmt.") J-1–203), as well as 21 additional facts proposed by the Receiver to which Defendants did not object, (*see id.* P-1, P-2, P-4–18, P-20–23), all which the Court incorporates by reference herein in their entirety.

## I.     Evidentiary Objections

The Receiver also submits evidence of intercompany transfers of money between Defendants during the Reporting Period, (*see* Jt. Stmt. P-24–P-71, P-73) to which Defendants lodge some variation of the same two objections. (*See* ECF No. 73-3 ("Objs.") at 4–31.)  Specifically, as to the Receiver's facts P-24 through P-58, Defendants object based on Federal Rules of Evidence 602 and 401:

> FRE 602. The Receiver fails to substantiate these calculations and Defendants do not know from where these numbers were derived.
>
> FRE 401: This fact is not relevant to proving the UVTA claim alleged in the SAC that any of the Defendants are liable for $6,120,570.35 as the immediate or mediate transferees of any net gain from the ANI Loan Program.  The Receiver also fails to offer any evidence as to what portion of [specific transfers involving specific Defendants] are (a) transfers of net gains from the ANI Loan Program, [(b) transfers not for reasonably equivalent value,] or [(b)/(c)] transfers that occurred before September 15, 2017 (outside the statute of limitations).

---

[2]   If not specifically defined in this Order, capitalized terms shall have the same meanings as those assigned by the Parties in their Joint Statement.  (*See* Jt. Stmt. ¶¶ 1–58.)

(*See* Objs. at 4–21.)  As to the remaining facts, Defendants object only under Rule 401:

> FRE 401: This fact is not relevant to proving the UVTA claim alleged in the SAC that [Defendant] is liable for $6,120,570.35 as the immediate or mediate transferees of any net gain from the ANI Loan Program.  [The Receiver also fails to offer any evidence as to whether any of these transfers occurred before September 15, 2017 (outside the statute of limitations).]

(*See* Objs. at 21–31.)  Regarding Defendants' Rule 401 objections, "objections to evidence on the ground that it is irrelevant . . . are . . . duplicative of the summary judgment standard itself." *See Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006). "Instead of *objecting*, parties should simply argue that the facts are not material."  *See id.* (emphasis in original).  Because these objections "are simply superfluous in this context," *see id.* (citing *Smith v. Cnty. of Humboldt*, 240 F. Supp. 2d 1109, 1115–16 (N.D. Cal. 2003)), the Court **OVERRULES** Defendants' objections under Rule 401.

As for Defendants' objections to the Receiver's alleged facts P-24 through P-58 under Rule 602, each cites to the Receiver's declaration and the Schedules attached thereto as evidentiary support.  (*See generally* Jt. Stmt. P-24–P-58.)  In her Declaration, the Receiver attests that,

> Where the matters stated in this declaration are statements of fact that are within my personal knowledge, they are true and correct.  Where the matters stated in this declaration are statements of fact that are not within my personal knowledge, they are (a) derived from my review of (1) the books and records of the Receivership Entities that came into my custody following my appointment, and (2) other records produced, including banking records, in response to subpoenas or otherwise, by third-party sources; (b) founded on additional information or analysis supplied to me by key personnel of my team and by third- party sources; or (c) based upon information and belief, and such statements are true and correct to the best of my knowledge, information, and belief.

(*See* ECF No. 67-2 ("Freitag Decl.") ¶ 2.)  Having reviewed each of the Receiver's proffered facts P-24 through P-58, the Court determines that the Receiver's work on the forensic accounting provides sufficient personal knowledge to lay the foundation for their admissibility.  *See Freitag v. Valeiras*, No. 21-CV-1625-LAB-AHG, 2024 WL 1355146,

at *6 (S.D. Cal. Mar. 29, 2024) (overruling similar objections in related clawback case); *see also, e.g.*, *Sec. & Exch. Comm'n v. Total Wealth Mgmt., Inc.*, No. 15-CV-226-BAS-RNB, 2018 WL 3456007, at *3 (S.D. Cal. July 18, 2018) (overruling objections to a receiver's personal knowledge where "the Receiver's testimony [wa]s (1) supported by evidence, such as business records, a ledger reflecting business transactions, and thousands of pages of documents in connection with the business and financial activities of the Receivership, and (2) the Receiver's own review of that evidence). The Court therefore **OVERRULES** Defendants' objections under Rule 602.

## II. Material Facts

To provide context and aid the Court in its analysis of the Receiver's remaining CUVTA claim, the Court provides a brief recitation of certain undisputed facts material to its analysis:

### A. *Peterson's Early Involvement in the ANI Loan Program*

"In early 2012, [Gina] Champion-Cain approached Peterson about the ANI Loan Program," (Jt. Smt. J-34), through which she solicited investments "to be used, as represented to investors, to fund loans to applicants who were seeking to acquire an ABC liquor license but did not have sufficient funds (i.e., equal to the license's purchase price) to, as required by law, deposit and maintain in an escrow account pending approval of their application by the ABC." (*Id.* J-12.) "Beginning in 2012, Peterson, initially through trusts he controlled,[3] placed substantial monies into the ANI Loan Program, transferring funds to ANI Development[4] in order to fund purported loans to liquor license applicants." (*Id.* J-36.)

///

---

[3]  "Since 2010, Peterson has been the trustee of the 1992 Trust[,]," (Jt. Stmt. J-37), the beneficiaries of which are Peterson's children. (*Id.* J-38.) Peterson has also been the trustee of the 1983 Trust, (*id.* J-39), the beneficiaries of which are Peterson, his wife, and his children. (*Id.* J-40.)

[4]  "ANI Development's business consisted primarily of running the ANI Loan Program," and "Champion-Cain was the managing member of ANI Development." (Jt. Stmt. J-14.)

"In light of the apparent success of the early loans, Peterson placed additional monies into the ANI Loan Program." (*Id.* J-41.) He also "actively recruited other persons and entities to provide funding for the ANI Loan Program." (*Id.* J-42.)

"In early 2014, Peterson, individually and as trustee of the 1983 Trust, entered into a funding agreement with ANI Development." (*Id.* J-45.) "Under the funding agreement between Peterson and ANI Development, Peterson agreed to provide funding for the ANI Loan Program (i.e., to provide money to ANI Development to fund loans to liquor license applicants)." (*Id.* J-46.) "Under the funding agreement between Peterson and ANI Development, Peterson, in exchange, would be paid 10% interest on the money provided, plus half of all points paid by a liquor license applicant to ANI Development." (*Id.* J-47.)

### B.     *Peterson Creates the Funding Entities*

"Peterson formed Kim Funding in 2014 for the purpose of providing further funding for the ANI Loan Program." (Jt. Stmt. J-48.) "Initially, the 1992 Trust held a 100% membership interest in Kim Funding." (*Id.* J-49.) "Since May 1, 2014, following an assignment, Peterson has held a 90% membership interest in Kim Funding, while his wife has held the remaining 10% membership interest therein." (*Id.* J-50.) "At all relevant times, Peterson has been the manager of and has otherwise controlled Kim Funding." (*Id.* J-51.)

"In early 2015, Kim Funding entered into a funding agreement with ANI Development." (*Id.* J-52.) "Under the funding agreement between Kim Funding and ANI Development, Kim Funding agreed to provide further funding for the ANI Loan Program." (*Id.* J-53.) "As part of that funding process, Kim Funding brought in millions of dollars from various ANI Loan Program Participants, including financial institutions, hedge funds, individuals, and other entities, to purportedly be used as loans to applicants for the ANI Loan Program." (*Id.* J-54.) "Champion-Cain and Peterson agreed that ANI Development and Kim Funding would split ANI Development's share of interest earned on the loans funded by monies raised through Kim Funding, with Kim Funding receiving 80% of the interest and ANI Development receiving 20%." (*Id.* J-55.)

"Peterson formed ABC Funding in late 2014 to serve as a vehicle to facilitate additional funding for the ANI Loan Program." (*Id.* J-56.) "Initially, Peterson held a 50% membership interest in ABC Funding, while [Joseph] Cohen has held the remaining 50% membership interest therein." (*Id.* J-57; *see also id.* ¶ 35.) "Since December 5, 2014, following an assignment from Peterson, Kim Funding has held a 50% membership interest in ABC Funding." (*Id.* J-58.) "ABC Management has been the manager of ABC Funding." (*Id.* J-59.)

"Since December 22, 2014, Kim Funding has held at least a 68% membership interest in ABC Management, while Cohen, as trustee of his trust, has held the remaining membership interest therein (which was later reduced from 32% to 30% to 25%)." (*Id.* J-60.) "Peterson and Cohen have been the managers of ABC Management." (*Id.* J-61.) "At all relevant times, Peterson, through ABC Management, has controlled ABC Funding." (*Id.* J-62.)

"Through ABC Funding, Peterson similarly brought in millions of dollars for the ANI Loan Program from dozens of additional individual ANI Loan Program Participants." (*Id.* J-63.) "Champion-Cain and Peterson agreed that ANI Development and ABC Funding would split ANI Development's share of interest earned on the loans funded by monies raised through ABC Funding, with ABC Funding receiving 80% of the interest and ANI Development receiving 20%." (*Id.* J-64.)

"Peterson formed ANI License in late 2015 to serve as another vehicle to facilitate additional funding for the ANI Loan Program." (*Id.* J-65.) "Since September 1, 2015, Kim Funding has held an 80% membership interest in ANI License, while GCC II LLC has held the remaining 20% membership interest therein." (*Id.* J-66.) "Peterson and Champion-Cain have been the managers of ANI License." (*Id.* J-67.) "At all relevant times, Peterson has controlled ANI License." (*Id.* J-68.)

"Through ANI License, Peterson brought in millions more dollars for the ANI Loan Program from another ANI Loan Program Participant." (*Id.* J-69.) "Similarly, Champion-Cain and Peterson agreed that ANI Development and ANI License would split ANI

Development's share of interest earned on the loans funded by monies raised through ANI License, with ANI License receiving 80% of the interest and ANI Development receiving 20%." (*Id.* J-70.)

### C. Peterson's Other Entities

"Initially, the 1992 Trust and the 1983 Trust each held a 50% membership interest in Kim Media." (Jt. Stmt. J-71.) "Since January 1, 2012, following an assignment from the 1992 Trust, the 1983 Trust has held a 99% membership interest in Kim Media, while the 1992 Trust has held the remaining 1% membership interest therein." (*Id.* J-72.) "Peterson has been the manager of Kim Media." (*Id.* J-73.)

"Since March 8, 2017, Peterson has been the sole shareholder in," (*id.* J-74), and "the sole director and officer of Kim Management." (*Id.* J-75.)

"Since November 3, 2017, Kim Funding has been the sole member in," (*id.* J-76), and "manager of Kim Aviation." (*Id.* J-77.)

"Since August 17, 2012, the 1983 Trust has held a 98% membership interest in Aero Drive, while Peterson's wife has held the remaining 2% membership interest therein." (*Id.* J-78.) "Peterson has been the manager of Aero Drive." (*Id.* J-79.)

"Since January 1, 2003, the 1983 Trust has held a 98% membership interest in Aero Drive Three, while Peterson's wife has held the remaining 2% membership interest therein." (*Id.* J-80.) "Peterson has been the manager of Aero Drive Three." (*Id.* J-81.)

"Since January 3, 2003, the 1992 Trust has held a 99% membership interest in Baltimore Drive, while Peterson has held the remaining 1% membership interest therein." (*Id.* J-82.) "Peterson has been the manager of Baltimore Drive." (*Id.* J-83.)

"Since December 16, 2016, Peterson has been the sole shareholder in George Palmer Corp." (*Id.* J-84.) "Peterson has been the sole director and officer of George Palmer Corp." (*Id.* J-85.)

"Peterson has been the trustee of the KF Pension Plan." (*Id.* J-86.) "The beneficiaries of the KF Pension Plan are Peterson and his wife." (*Id.* J-87.)

///

### D. Transfers Involving Defendants Related to the ANI Loan Program

Of Defendants, Peterson, the 1992 Trust, the 1983 Trust, the Funding Entities and ABC Management each transferred or received funds to or from the Receivership Entities or Chicago Title,[5] while the 1983 Trust, the Funding Entities, ABC Management, and Kim Media transferred or received funds to or from ANI Loan Program Participants.[6] (*See* Mem. at 13–14; *see also* Jt. Stmt. J-88–141; ECF No. 67-6 at 8–94 (Schedules A–DD).)

Collectively, Defendants received $147,089,775.03 from the Receivership Entities or Chicago Title and transferred $140,969,204.68 to the Receivership Entities or Chicago Title, resulting in a net gain or profit of $6,120,570.35, and received $83,218,955.72 directly from ANI Loan Participants and transferred $76,327,670.02 directly to ANI Loan Participants, resulting in a next gain or profit of $6,891,285.70. (*See* Mem. at 14; ECF No. 67-6 at 94 (Schedule DD); *see also* Jt. Stmt. J-88–141; ECF No. 67-6 at 8–92 (Schedules A–CC).) Although Defendants' total net gain or profit from the ANI Loan Program was $13,011,856.05, (*see id.*), the Receiver seeks to recover only the $6,120,570.35 net gain from Defendants' transfers between them and the Receivership Entities or Chicago Title. (*See* Mem. at 21 n.8.) The specific transfers at issue were all made to Kim Funding:

| Date | Amount | Transferor | Transferee | Citation |
|---|---|---|---|---|
| 8/16/2019 | $236,767.29 | Chicago Title | Kim Funding | ECF No. 67-6 at 36 |
| 8/7/2019 | $1,036,000.00 | Chicago Title | Kim Funding | ECF No. 67-6 at 36 |
| 8/2/2019 | $716,119.94 | Chicago Title | Kim Funding | ECF No. 67-6 at 36 |
| 7/26/2019 | $1,281,250.00 | Chicago Title | Kim Funding | ECF No. 67-6 at 36 |
| 7/16/2019 | $119,075.35 | Chicago Title | Kim Funding | ECF No. 67-6 at 36 |

---

[5] Specifically, Peterson and the 1992 Trust transferred funds to the Receivership Entities or Chicago Title, while the 1983 Trust, the Funding Entities, and ABC Management both transferred funds to and received funds from the Receivership Entities and Chicago Title.

[6] Specifically, the 1983 Trust and Kim Media only received funds from ANI Loan Program Participants, while the Funding Entities and ABC Management both transferred funds to and received funds from ANI Loan Program Participants.

| 7/15/2019 | $2,233,875.00 | Chicago Title | Kim Funding | ECF No. 67-6 at 36 |
| 7/11/2019 | $3,784.93 | ANI Development | Kim Funding | ECF No. 67-6 at 30 |
| 7/9/2019 | $302,826.36 | ANI Development | Kim Funding | ECF No. 67-6 at 30 |
| 6/27/2019 | $190,871.48[7] | Chicago Title | Kim Funding | ECF No. 67-6 at 36 |

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a party may move for summary judgment as to a claim or defense or part of a claim or defense. Fed. R. Civ. P. 56(a). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Although materiality is determined by substantive law, "[o]nly disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986). A dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When considering the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. The moving party may meet this burden by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'"

/ / /

---

[7] Although Chicago Title transferred $342,215.77 to Kim Funding on June 27, 2019, (*see* ECF No. 67-6 at 36), the Receiver only seeks to recover $190,871.48 of that. (*See* Reply at 9 n.8.)

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial. *Celotex*, 477 U.S. at 324. This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324; *see also Anderson*, 477 U.S. at 248. Accordingly, the non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] upon mere allegations or denials of his pleading." *Anderson*, 477 U.S. at 256.

## ANALYSIS

As a result of the First and Second Prior Orders, the sole issue that confronts the Court is whether the Receiver is entitled to summary adjudication as to her first cause of action, through which she seeks to recover under CUVTA "**$8,043,621.78** (representing $6,120,570.35 in funds fraudulently transferred to Defendants and $1,923,051.43 in prejudgment interest[8])" of what Defendants jointly received in excess of amounts they transferred to Chicago Title escrow accounts, their investors, and the Receivership Entities. (*See* Mot. at 2–4; Reply at 12; SAC ¶¶ 144, 151–57; *see also generally* Mem.) Defendants do not appear to contest that Kim Funding received a net gain of at least $6,120,570.35 from the Receivership Entities and Chicago Title. (*See* Opp'n at 9 (calculating a net gain of $17,049,340.34).) In conjunction with the First Prior Order and the Ponzi scheme presumption, *Freitag v. Valeiras*, No. 21-CV-1625-LAB-AHG, 2024 WL 1355146, at *8

---

[8] As of the filing of the Motion on January 17, 2024.

(S.D. Cal. Mar. 29, 2024) (citing *In re Slatkin*, 525 F.3d 805, 814 (9th Cir. 2008)), there is no question that the Receiver could recover this amount from Kim Funding under CUVTA. But because Kim Funding is "now-defunct and assetless,"[9] (*see* Reply at 3), such a victory would be purely symbolic. The Receiver therefore seeks to recover from Defendants collectively under California Civil Code §§ 3439.08(b)(1)(A), 3439(b)(1)(B), and 3439.07(a)(3).[10]

---

[9] At oral argument, counsel for Defendants contended that they "d[id]n't believe there [wa]s any evidence in the record on this motion that Kim Funding is either defunct or doesn't have any assets." (*See* Tr. at 64:9–12.) But "Peterson formed Kim Funding . . . for the purpose of providing further funding for the ANI Loan Program," (*see* Jt. Stmt. J-48), and that Court takes judicial notice of the fact that an involuntary Chapter 7 petition was filed against Kim Funding, LLC shortly after the SEC Action was filed, *see In re Kim Funding, LLC*, No. 19-bk-5479-CL7 (S.D. Cal. Bankr. filed Sept. 11, 2019). In any event, if the Receiver believed she could recover against Kim Funding after analyzing its bank accounts, (*see* ECF No. 74-1 ("Supp. Freitag Decl.") ¶ 6), there would have been no reason for her to seek summary adjudication against all Defendants.

[10] In relevant part, Section 3439.08 provides:

> (b) To the extent a transfer is avoidable in an action by a creditor under paragraph (1) of subdivision (a) of Section 3439.07, the following rules apply:
>
> (1) Except as otherwise provided in this section, the creditor may recover judgment for the value of the asset transferred, as adjusted under subdivision (c), or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against the following:
>
> (A) The first transferee of the asset or the person for whose benefit the transfer was made.
>
> (B) An immediate or mediate transferee of the first transferee, other than either of the following:
>
> (i) A good faith transferee that took for value.
>
> (ii) An immediate or mediate good faith transferee of a person described in clause (i).

Cal. Civ. Code § 3439.08(b)(1). Section 3439.07 provides, in relevant part:

> (a) In an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in Section 3439.08, may obtain:

Specifically, the Receiver contends that "all Defendants should be held jointly liable on the Fraudulent-Transfer Claim in this case due to the manner in which (a) Peterson controlled and extensively and freely moved funds between and among all Defendants and (b) they haphazardly transacted with third parties, including the Receivership Entities, Chicago Title, and ANI Loan Program Participants." (*See* Mem. at 23.) "Under these circumstances, a coherent tracing analysis identifying subsequent-transfer Defendants and the specific amounts each received is impracticable," (*see id.*), and "it would be grossly inequitable and unfair to the Participants who suffered losses from the scheme to allow Defendants to avoid collection entirely by leaving Kim Funding as a defunct, shell entity and arguing that, because of Defendants' own commingling and rapid churning of funds, there is insufficient tracing to show Peterson's other entities and trusts (which actually hold assets) benefited from the Ponzi-scheme net profits." (*See* Reply at 6.)

Ultimately, the Court agrees with the Receiver. "[T]he statute states that judgment may be had against transferees or 'the person *for whose benefit* the transfer was made.'" *Qwest Commc'ns Corp. v. Weisz*, 278 F. Supp. 2d 1188, 1191 (S.D. Cal. 2003) (emphasis in original) (quoting Cal. Civ. Code § 3439.08(b)(1) (2001)[11]). As the Honorable Rudi M. Brewster explained in *Qwest Communications*, "[i]n most cases, the only likely beneficiaries of a fraudulent transfer are the debtor who avoids his creditors and the

---

. . .

(3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure, the following:

. . .

(C) Any other relief the circumstances may require.

Cal. Civ. Code § 3439.07(a)(3)(C).

[11] Although the verbiage in the current version of the statute has not changed, the current citation is Section 3439.08(b)(1)(A).

transferee who receives the assets. That is not so in all cases, however, especially where, as here, the debtor is a corporation." *See id.* Indeed, "the party who forces a debtor to make a transfer is almost always the entity for whose benefit such transfer was made, and thus is generally always subject to [liability]." *See id.* at 1192 (alteration in original and internal quotation marks omitted) (quoting *In re Lucas Dallas, Inc.*, 185 B.R. 801, 809 (9th Cir. B.A.P. 1995)). Further, "[CUV]TA also includes a broad remedial provision, § 3439.07(a)(3)(C), which permits a court, '[s]ubject to applicable principles of equity,' to award '[a]ny other relief the circumstances may require.'" *See Gutierrez v. Givens*, 1 F. Supp. 2d 1077, 1087 (S.D. Cal. 1998).

Here, it is undisputed that Mr. Peterson, through Kim Funding, was business partners with Ms. Champion-Cain and acquired a 1% economic membership interest and 50% voting membership interest in ANI Development. (*See* Jt. Stmt. J-41.) It is also undisputed that Kim Funding has always been wholly owned by Mr. Peterson's family and wholly controlled by Mr. Peterson. (*See id.* J-37, J-38, J-48–J-51.) The remaining Defendants are also owned in large part by Mr. Peterson or his family and are under his control. (*See* J-37, J-38 (1992 Trust); J-39, J-40 (1983 Trust); J-48–J-51 (Kim Funding); J-56–J59, J-62 (ABC Funding); J-60, J-61 (ABC Management); J-65–J-68 (ANI License); J-71–J-73 (Kim Media); J-74, J-75 (Kim Management); J-76, J-77 (Kim Aviation); J-78, J-79 (Aero Drive); J-80, J-81 (Aero Drive Three); J-82, J-83 (Baltimore Drive); J-84, J-85 (George Palmer Corp.); J-86, J-87 (KF Pension Plan).) Although this common ownership and control would appear to suffice under several cases cited by the Receiver,[12] the Court is also

---

[12] *See, e.g.*, *SBC Berlin 2012-2014, Ltd. v. Babywatch, Inc.*, No. 18-CV-07611-EDL, 2019 WL 13203776, at *12 (N.D. Cal. Oct. 10, 2019) ("Given [individual defendants] Mur and Srsen's ownership of both the transferor and transferee companies, it is plausible that Mur and Srsen were 'person[s] for whose benefit the transfer was made.'" (second alteration in original) (quoting Cal. Civ. Code § 3439.08(b)(1)(A))); *Oracle Am., Inc. v. Appleby*, No. 16-CV-02090-JST, 2016 WL 5339799, at *9 (N.D. Cal. Sept. 22, 2016) ("Similarly [to *Qwest Communications*], here, it is a matter of common sense that the co-owners of Terix, Appleby and Olding, stood to benefit from the assets of Terix being fraudulently transferred to TUSA, Ermine IP, and Ermine Services, which Appleby and Olding also co-owned. . . . Moreover, as the *Quest* court noted, the party who forces a debtor to make a transfer is almost always the

mindful that "[t]here are limits to the legal assessment of the type of 'benefit' that will subject a beneficiary to liability for the debtor's alleged fraudulent transfer." *See Lo v. Lee*, 24 Cal. App. 5th 1065, 1073 (2018).

In 2018, having found no "California cases defining 'the person for whose benefit the transfer was made' within the meaning of" Section 3439.08(b)(1)(A), the California Court of Appeal in *Lo* looked to cases construing the Bankruptcy Code counterpart, 11 U.S.C. § 550(a), to conclude that "[t]ransfer beneficiary status depends on three aspects of the benefit: (1) it must actually have been received by the beneficiary; (2) it must be quantifiable; and (3) it must be accessible to the beneficiary." *See Lo*, 24 Cal. App. 5th at 1073 (internal quotation marks omitted) (quoting *In re Brooke Corp.*, 488 B.R. 459, 468 (Bankr. D. Kan. 2013)). "In addressing the first element, . . . 'an actual benefit rather than a merely intended one must be received in order for the beneficiary to be liable.'" *Id.* at 1074 (quoting *Baldi v. Lynch (In re McCook Metals LLC)*, 319 B.R. 570, 591 (Bankr. N.D. Ill. 2005)). "As to the second prong, . . . for a benefit to be 'quantifiable,' '[a] merely theoretical benefit is not sufficient, since it would not be subject to disgorgement.'" *Id.* (second alteration in original) (quoting *McCook Metals*, 319 B.R. at 591). Finally, the beneficiary must have control or access to the funds. *See id.* at 1074–75 (citing *McCook Metals*, 319 B.R. at 592).

Similarly and more recently, a federal district court in this Circuit concluded that,

> While at least one court in this circuit[, *i.e.*, *Qwest Communications*,] has found th[e] argument [that a majority shareholder for the transferee is a transfer-beneficiary] persuasive, the position more consistent with corporate law is that shareholders, officers, and directors are not liable for transfers to their corporation unless they "actually received distributions of the transferred

---

entity for whose benefit such transfer was made. . . . Here, Appleby and Olding are alleged to have forced Terix to make the transfer. Accordingly, it is reasonable to infer that they were the person[s] for whose benefit the transfer was made." (internal quotation marks omitted and fourth alteration in original) (first quoting *Quest Commc'ns*, 278 F. Supp. 2d at 1191; then quoting Cal. Civ. Code § 3439.08(a))); *Qwest Commc'ns*, 278 F. Supp. 2d at 1191 ("It is a matter of common sense that the majority shareholder of a corporation ([individual defendant] Jonathan Weisz) would stand to benefit if the assets of his failing business were fraudulently transferred to his father (Robert Weisz).").

property" (making them subsequent transferees under § 3439.08) or "a showing can be made to pierce the corporate veil."

*See Severs v. Garcia*, No. 24-CV-01456-EMC (EMC), 2025 WL 2458862, at *3 n.2 (N.D. Cal. Aug. 25, 2025) (*comparing Qwest Commc'ns*, 278 F. Supp. 2d at 1191, *with Schechter v. 5841 Bldg. Corp. (In re Hansen)*, 341 B.R. 638, 645–46 (Bankr. N.D. Ill. 2006))). Under California law, "[t]he 'mere fact of sole ownership and control does not eviscerate the separate corporate identity that is the foundation of corporate law.'" *Id.* (quoting *Katzir's Floor & Home Design, Inc. v. M-MLS.COM*, 394 F.3d 1143, 1149 (9th Cir. 2004)). "To impute alter ego liability, a plaintiff must show that (1) such a unity of interest and ownership between the corporation and its equitable owner that no separation actually exists, and (2) an inequitable result if the acts in question are treated as those of the corporation alone." *Id.* at *3 (citing *Leek v. Cooper*, 194 Cal. App. 4th 399, 417 (2011)).

Here, the Receiver has demonstrated, based on "[t]he movement of funds to, from, and between Defendants[,] . . . that, when transfers were received by a Defendant, such funds were not really owned by that Defendant, but instead were owned by Defendants generally (i.e., by Peterson and his entities, as a whole) and used however Peterson saw fit at that time." (*See* Mem. at 23; *see also id.* at 23–26; Reply at 4–6.) Because the Court has overruled Defendants' evidentiary objections, *see supra* pages 4–6, the Receiver's substantial evidence of intercompany transfers among Defendants—including, for example, numerous instances in which "the aggregate amount that one Defendant transferred to another Defendant was sometimes substantially more than the aggregate amount that the former received from the latter (and was sometimes zero)," (*see* Mem. at 24; *see also* Jt. Stmt. P-26, P-30, P-32–33, P-35, P-36, P-38, P-40, P-52–56); "funds from one Defendant were transferred to another Defendant whenever the balance in the latter's account, immediately prior to that 'intercompany' transfer, was insufficient to make a certain payment to a third party," (*see* Mem. at 24; *see also id.* at 24–25; Jt. Stmt. J-193–98, P-66–68); and "funds transferred from one Defendant to another Defendant were significantly derived from funds related to the Program," (*see* Mem. at 25; *see also id.* at

25–26; Jt. Stmt. J-188–90, J-199, P-62, P-64, P-69–72)—is undisputed. As such, "there was no true separateness to how Peterson maintained his entities, their bank accounts, and the funds flowing into and out of them." (*See* Mem. at 26.)

If Mr. Peterson did not respect corporate formalities, the Court should not be so constrained, particularly where doing so would result in an inequitable windfall to an "insider"—even if unknowing—to the fraudulent scheme.[13]  *See U.S. Sec. & Exch. Comm'n v. Peterson*, No. 23-55252, 2024 WL 5670686, at *1 (9th Cir. Apr. 28, 2025) (second alteration in original) ("Case law and the record support the district court's deeming Appellants [Peterson, Kim Funding, and ABC Funding] to be Ponzi-scheme 'insiders,' '[n]otwithstanding Peterson's ignorance of the fraud.'"). Accordingly, whether under the standard laid out by the California Court of Appeal or that for alter ego liability presented by *Severs*, the Receiver has met her burden in establishing that there exist no material disputes of fact that Defendants should be held jointly liable under Sections 3439.08(b)(1)(A), 3439(b)(1)(B), and/or 3439.07(a)(3) for the $6,120,570.35 net profit amount and any prejudgment interest. The Court therefore **GRANTS** the Receiver's Motion for summary judgment as to her first cause of action under CUVTA against all Defendants, jointly and severally.

Further, in its First Prior Order, the Court concluded that it would be equitable to award prejudgment interest in this case. (*See* 1st Prior Order at 9–10.) As of the date the Motion was filed on January 17, 2024, the Receiver sought prejudgment interest at 7% totaling $1,923,051.43. (*See* Mem. at 27.) With interest accruing at $1,173.81 per diem,

---

[13]  Although Mr. Peterson, Kim Funding, and ABC Funding's appeal of Judge Burns' February 24, 2023 Order 1) Approving Receiver's Recommended Treatment of Claims (Allowed, Disallowed, Disputed), [Dkt. 807-12, 807-15, 853-3]; 2) Approving Distribution Methodology, [Dkt. 807]; 3) Approving Proposed Distribution Plan, [Dkt. 807]; and 4) Granting Leave to File Excess Pages, [Dkt. 806] (19-CV-1628 ECF No. 958 (the "Distribution Order")) was still pending when the Court held its hearing on the instant Motion on November 7, 2024, (*see* ECF No. 87 ("Tr.") at 4:14–12:17), the Ninth Circuit affirmed Judge Burns' Distribution Order on April 28, 2025. *See generally Peterson*, 2024 WL 5670686.

as of the date when the Court issued the First Prior Order, the total amount of prejudgment interest totals $2,343,275.41.[14]

## CONCLUSION

In light of the foregoing, the Court **GRANTS** the Receiver's Motion for Summary Judgment (ECF No. 67) as to her first cause of action under CUVTA. Specifically, the Court **GRANTS** summary judgment in favor the Receiver and against Defendants, jointly and severally, in the amount of **$8,463,845.76**, representing $6,120,570.35 in net profits and $2,343,275.41 in prejudgment interest as of January 9, 2025. The Receiver **SHALL FILE** a status report concerning this action within fourteen (14) days of the electronic docketing of this Order.

**IT IS SO ORDERED.**

Dated: October 20, 2025

_____
Honorable Todd W. Robinson
United States District Judge

---

[14]  Because much of the delay between the issuance of the instant Order and the First Prior Order was not the fault of Defendants, the Court declines to award prejudgment interest accruing after the date on which the First Prior Order issued. By the Court's calculation, 358 days elapsed between the filing of this Motion on January 17, 2024, and the issuance of the First Prior Order on January 9, 2025. With interest accruing at $1,173.81 per diem, this means that an additional $420,223.98 in interest had accrued as of January 9, 2025, bringing the total prejudgment interest to $2,343,275.41.